## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

DONALD R. FLESHNER,

      Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social
Security,

      Defendant.

**No. 06-CV-3018-DEO**

**ORDER**

_____

This case involves an application for disability benefits under Title II of the Social Security Act, 42 U.S.C. §401 et seq. Plaintiff, Donald Fleshner, (hereinafter "Fleshner"), filed this action requesting reversal of the Commissioner's decision that he is not disabled.

## I. INTRODUCTION

### A. Procedural History

Fleshner filed his application for disability benefits on January 8, 2002. Tr. 81A. His application was denied initially (Tr. 69-73) and upon reconsideration (Tr. 76-79). A hearing was held before an Administrative Law Judge ("ALJ") on July 29, 2004. Tr. 542-62. A supplemental hearing was held on December 21, 2004. Tr. 564-71. On January 12, 2005, the ALJ determined that Fleshner was not "disabled" within the

meaning of the Social Security Act. Tr. 22-41. Fleshner requested review of the ALJ's decision of January 12, 2005, but the Appeals Council denied his request. Tr. 20; 10-12. Therefore, the ALJ's decision stands as the final decision of the Commissioner. Tr. 10.

This Court held a hearing on May 23, 2007. After careful consideration of the parties' written and oral arguments, the Court reverses the decision of the Administrative Law Judge ("ALJ") and awards benefits as of June 14, 2004.

**II. BACKGROUND**

**A. Medical Background**

Fleshner is a 52 year-old man who claims a disability onset date of December 11, 2001. Tr. 370; 81A. Generally, his complaints consist of several ailments of his cervical and thoracic spine, depression, osteoarthritis in his knees, migraines, rotator cuff tendinitis, hypertension and carpal tunnel syndrome. Plaintiff's Brief, Doc. No. 13-1, p. 2. Fleshner has extensive medical records, and the Court believes that it is important to include the pertinent portions below.

**1. Cindy Huwe, M.D.**

Dr. Huwe is Fleshner's primary care physician and on

2

January 21, 2002, she wrote a letter to Mr. Brian Maloney of Iowa Disability Determination Services regarding her care of Fleshner. Tr. 232. In that letter, she stated that Fleshner is disabled from severe and worsening osteoarthritis. Tr. 232. She recited the care Fleshner has been provided by Drs. Federhofer, Palma and Bekavac (discussed below) and stated that all of them believe Fleshner "cannot do a physical line of work". Tr. 232. Dr. Huwe also indicated Fleshner has suicidal tendencies due to his chronic pain and that she had him work with psychologist, Dr. Naomi McCormick. Tr. 232-33. Dr. Huwe noted that all doctors have been unsuccessful in eliminating his pain. Tr. 233. She further noted that he should not be kneeling, stooping, crawling or climbing in any manor and that he should not have a "physical job". Tr. 233. Dr. Huwe stated that Fleshner "is completely disabled in his work to do his job" and that she considers him "totally disabled." Tr. 233. She lists his current medications as Darvocet[1], Depakote[2], Celebrex[3], Trazodone[4], Effexor[5] and

---

[1]Narcotic pain reliever. (All references to medical terminology were obtained by one of the following sources: National Library of Medicine/National Institutes of Health online medical dictionary:

(continued…)

Case 3:06-cv-03018-DEO   Document 19   Filed 08/27/07   Page 3 of 43

Duragesic[6].  Tr. 233.

Dr. Huwe wrote a letter to Disability Services on February 13, 2003, reaffirming her belief that based on her care of him, Fleshner is not employable in his current status. Tr. 363.  She stated that he faces worsening degeneration and pain that will be chronic and not be amenable to surgical interventions.  Tr. 363.

Dr. Huwe again wrote a letter to Disability Services on June 14, 2004, on Fleshner's behalf, explaining his past history and her opinion that he is not employable.  Tr. 530. She stated that he takes anti-inflammatories, narcotics, antidepressants and seizure medications.  Tr. 530.

---

[1](...continued)
http://www.nlm.nih.gov/medlineplus/mplusdictionary.html, Dorland's Illustrated Medical Dictionary, 30th ed., 2003 and WebMD Drugs and Treatments database: http://www.webmd.com/drugs/index-drugs.aspx.

[2]Drug used to treat seizure disorders, certain psychotic conditions and to prevent migraine headaches.

[3]Non-steriodal anti-inflammatory drug.

[4]Antidepressant.

[5]Antidepressant.

[6]Strong narcotic pain reliever.

4

## 2. Claro T. Palma, M.D.

Dr. Palma is an internal medicine doctor that Fleshner saw on a regular basis beginning in 2000 for knee and back pain and to receive cortisone injections. See generally, Transcript starting at 138. In November of 2001, after several visits, Dr. Palma "encouraged him to apply for disability as his symptoms actually preclude his continuing his work at the current level." Tr. 204. This statement was memorialized in a update letter to Fleshner's primary-care provider, Dr. Cindy Huwe. Tr. 204.

Also of note is an office visit Fleshner had with Dr. Palma on May 29, 2003, wherein he was diagnosed with chronic back pain secondary to degenerative disc disease of the cervical and lumbar spine with recent increase in symptoms, rotator cuff tendinitis of the right shoulder with persistent pain, osteoarthritis of the peripheral joints with bilateral knee pain, medial epicondylitis[7] of the left elbow and a history of depression. Tr. 395.

On July 29, 2004, Dr. Palma wrote a letter noting that Fleshner has degenerative disk disease of the cervical and

---

[7]Inflammation of a joint or adjacent tissues.

5

lumbar spine and rotator cuff tendinitis in both shoulders. Tr. 535. Dr. Palma opined that Fleshner is unable to be gainfully employed in any job involving physical exertion of his upper extremities or prolonged standing or sitting, bending or stooping. Tr. 535.

### 3. Dr. Mueller

Dr. Mueller is an orthopedic surgeon who performed arthroscopic knee surgery on Fleshner on December 11, 2001. Tr. 212. The surgery revealed a torn ligament and a tear in his medial meniscus.[8] Tr. 212.

### 4. Alan K. Brown, M.D.

Fleshner underwent a gallbladder cholecystectomy[9] at Allen Memorial Hospital on March 2, 2001. Tr. 143. The diagnosis from that procedure includes cholecystitis[10] and cholelithiasis.[11] Tr. 143.

### 5. Joseph E. Hart, M.D., F.A.C.S.

Fleshner saw Dr. Hart on September 20, 2001, complaining

---

[8] Cartilage in the knee.

[9] Surgical excision of the gallbladder.

[10] Inflammation of the gallbladder.

[11] Production of gallstones.

6

of progressively diminished hearing in his right ear. Tr. 167. He was diagnosed with moderately severe sensorineural hearing loss AD. Tr. 167.

Dr. Hart ordered an MRI of Fleshner's brain because of right side hearing loss, tinnitus and vertigo, which was performed on September 26, 2001. Tr. 172. There was evidence of a small cystic lesion that was of "questionable significance", but no other abnormalities were seen. Tr. 172. Dr. Hart explained that there was an abnormality in his right cerebral peduncle[12] that was possibly caused by a recent small stroke. Tr. 174.

### 6. Robert N. Federhofer, D.O.

Fleshner was referred by Dr. Palma to Dr. Federhofer in the Allen Memorial Hospital pain clinic. See generally, Tr. 177. After several visits, Dr. Federhofer wrote a letter on Fleshner's behalf stating that he has been treating Fleshner for headache symptoms and back pain. Tr. 223. Dr. Federhofer explained that he has assessed Fleshner as having tension headaches, intermittent migraine headaches, degenerative

---

[12] Either of two large bundles of nerve fibers passing from the pons forward and outward to form the main connection between the cerebral hemispheres and the spinal cord.

7

arthritis of the cervical, thoracic and lumbar spine and degenerative disk disease at all three levels. Tr. 223. Dr. Federhofer placed Fleshner on strong medications including Depakote[13] and Trazodone[14]. Tr. 247.

On August 8, 2002, Dr. Federhofer wrote a letter to Disability Services responding to a request of information about Fleshner. Tr. 292. Dr. Federhofer explained that Fleshner has degenerative arthritis of the neck, compression fractures in his thoracic spine and degenerative changes in his cervical and thoracic spine that are causing tension-type headaches and occasionally migraines. Tr. 292. Dr. Federhofer stated that Fleshner cannot perform any work that requires him to crawl, kneel, stand, prolonged extension or flexion of the neck or activities requiring heavy lifting. Tr. 292. He also should not work in cold area or at heights. Tr. 292.

Fleshner followed-up with Dr. Federhofer on June 5, 2003, complaining of increased headaches. Tr. 408. Dr. Federhofer

---

[13]Drug used to treat seizure disorders, certain psychiatric conditions and to prevent migraine headaches.

[14]Antidepressant.

8

assessed that the majority of Fleshner's symptoms appear to be fibromyalgia[15] with the tension type headaches.  Tr. 409.  Dr. Federhofer added Tizanidine[16] to his therapy.  Tr. 409.

Fleshner followed-up with Dr. Federhofer on August 7, 2003, and indicated he had a good response to the July 1 injection.  Tr. 407.  Dr. Federhofer diagnosed him with degenerative disk disease of the lumbar spine at L2-3 and L4-5 levels and facet joint disease associated at these levels. Tr. 409.  During this visit, Fleshner was administered a second epidural.  Tr. 407.

Fleshner saw Dr. Federhofer on May 18, 2004, complaining of significant neck pain and is diagnosed with degenerative disk disease of the cervical spine.  Tr. 505.  Dr. Federhofer also noted continuing low back pain and discomfort that he believes is due in part to facet disease.  Tr. 505.  Fleshner is told to return for a series of epidural injections.  Tr. 505.

---

[15]A chronic disorder characterized by widespread pain, tenderness and stiffness of muscles and associated connective tissue structures that is typically accompanied by fatigue, headache and sleep disturbances.

[16]Drug used to treat muscle tightness and cramping (spasm).

9

On June 26, 2004, Dr. Federhofer wrote a letter to "Benefit Team Services", at the request of the Fleshners, to provide information about his care of Fleshner. Tr. 507. Dr. Federhofer recommended that Fleshner be placed on disability "due to pain and discomfort at the cervical and lower lumbar spine area with the cervical pain being responsible for migraine headaches as a cervicogenic headache pattern." Tr. 507. Dr. Federhofer also noted that the number of medications Fleshner was taking can affect his ability to function on a daily basis. Tr. 507. Dr. Federhofer opined that Fleshner "could not function in an industrial setting performing manual labor and would have difficulty concentrating for prolonged periods of time." Tr. 507. Dr. Federhofer also explained that Fleshner would require ongoing and recurrent pain therapy in addition to treatment for depression. Tr. 508.

### 7. Tom B. Hoogestraat, D.C.

On August 9, 2002, Chiropractor Tom Hoogestratt wrote a letter to the Iowa Disability Determination Services Bureau regarding his treatment of Fleshner. Tr. 293. Dr. Hoogestraat stated that Fleshner had been his patient for the last 25 years, and he had treated him for a variety of

ailments.  Tr. 293.  Dr. Hoogestraat stated that Fleshner's ailments make it very difficult for him to work without suffering pain and discomfort.  Tr. 293.  Dr. Hoogestraat recommended the following work-related capacities:  Lifting and carrying a minimum of 10-15 pounds infrequently; minimal standing, walking and sitting due to degenerative changes in his spine; no stooping, climbing, kneeling or crawling, and; minimal traveling due to pain and discomfort.  Tr. 293.  Dr. Hoogestraat further stated that "because of his degenerative conditions, there is not a work environment that he can function in without having pain and discomfort."  Tr. 293.

On June 29, 2004, Dr. Hoogestraat wrote a letter to the state of Iowa Disability Services regarding his care of Fleshner.  Tr. 509.  Dr. Hoogestraat explained his treatment and diagnosis of Fleshner, including chronic pain, and stated that he "strongly support[s]" Fleshner's request for disability.  Tr. 509.

### 8.  L. Wimal Perera, M.D.

Dr. Huwe referred Fleshner to neurosurgeon Perera for radiating pain through is right hip and anterior thigh for more than ten years.  Tr. 283.  Dr. Perera reviewed Fleshner's

11

medical history and basically found no explanation for his persistent thoracic pain radiating into his knee. Tr. 284. He stated that Fleshner should not undergo any further steroid injections for at least six months. Tr. 284. Dr. Perera stated he has "nothing to offer" Fleshner and noted that seven other physicians had already declared him disabled. Tr. 284.

### 9. Ivo Bekavac, M.D., Ph.D.

Fleshner is referred to Dr. Bekavac for abnormal MRI findings. Tr. 180. On October 22, 2001, Fleshner underwent an MRI of his cervical spine. Tr. 185. The impression revealed disc protrusion and end plate osteophyte causing left-sided spinal canal and left neural foraminal narrowing at the C6-7 level. Tr. 185. On the same day, an MRI of Fleshner's thoracic spine revealed lower thoracic kyphosis,[17] lower thoracic degenerative spondylosis[18] but no evidence of a disc herniation. Tr. 187.

### 10. Carl Aagesen, D.O.

Fleshner was seen by Dr. Aagesen on June 9, 2003, upon

---

[17] Exaggerated outward curvature of the thoracic (middle) region of the spinal column resulting in a rounded upper back.

[18] Any of various degenerative diseases of the spine.

12

the referral of clinical health psychologist Naomi McCormick. Tr. 412. Dr. Aagesen diagnosed him with major depressive disorder and generalized anxiety disorder and recommends increasing his Effexor dosage. Tr. 414.

**11. Jeffrey A. Clark, D.O., CVMS, P.C.**

Fleshner was referred to Dr. Clark by Dr. Spence for chronic right-sided low back and leg pain and saw him on February 10, 2004. Tr. 502. Dr. Clark diagnosed Fleshner with mild degenerative joint disease of the right hip and a history of chronic pain. Tr. 504.

**12. Stephen Kieszkowski, OTR/L**

Mr. Kieszkowski performed an evaluation of Fleshner at the request of Vocational Rehabilitation Services. Tr. 536. Mr. Kieszkowski's findings were that Fleshner would be incapable of sustaining light-level work for an 8-hour day; he would need to be able to alternate between sitting, standing and walking; he exhibits multiple areas of dysfunction; has decreased muscle strength in bilateral hips, knees and shoulders; cannot work with his arms over his head; cannot stand, squat, crouch, climb stairs or a ladder, and; would require self-paced work and a flexible work schedule. Tr.

540-41; 536-539.

**B.   Education and Employment Background**

Fleshner graduated from high school and studied welding at a technical school for six months after that.  Tr. 545.  He can read but claims that he does not comprehend well, which is evidenced by the fact that he was in remedial reading classes in high school.  Tr. 545.  Fleshner's prior work history includes truck driver from 6/94 - 12/01; welder from 9/87 - 6/94; and chipper/grinder from 7/86 - 9/87.  Tr. 86.

**III.      ADMINISTRATIVE LAW HEARINGS**

**A.  Hearing of July 29, 2004**

A hearing before an Administrative Law Judge ("ALJ") was held on July 29, 2004.  Much information about Fleshner's employment and medical histories was elicited at this hearing, which will be summarized below.

From June 1994, until December 2001, Fleshner was a truck driver for Viking Pump.  Tr. 546.  He would make pick-ups and deliveries between different plants in Cedar Falls and elsewhere.  Tr. 546.  While performing that job, he regularly lifted between 59 and 75 pounds.  Tr. 546.  From 1987 until 1994, Fleshner worked as a welder for Viking Pump.  Tr. 547.

14

While working as a welder, he would normally lift around 100 pounds. Tr. 547. From 1986 to 1987, he worked as a chipper/grinder for Viking Pump, again lifting around 100 pounds normally. Tr. 547. During Fleshner's last couple of years at Viking Pump, specifically in 2000, he missed a lot of work because of back pain and headaches. Tr. 547. Prior to this, he would normally work full days. Tr. 547. During this same time, Fleshner also had a farm that he worked for several years prior but could no longer keep up with it. Tr. 548.

Fleshner described problems he has with his knees, including operations on both. Tr. 548. He testified that all cartilage was removed from his right knee, and there are tendons and cartilage missing in his left knee. Tr. 548. He has spinal stenosis and degeneration of the disk and arthritis in his shoulders. Tr. 548. He explained that he has received cortisone shots in his shoulders and knees for many years. Tr. 548-549. Apparently, Fleshner broke his back in three places in a motorcycle accident and developed arthritis in some of those places. Tr. 549. His doctors have been treating him with epidurals and what he calls burning of the nerves in his back. Tr. 549. He stated that Dr. Palma had

15

told him numerous times to quit working.  Tr. 549.

Fleshner claimed that he experiences the most pain in his lower back and hips.  Tr. 550.  He described sharp, stabbing pain in his right side and down his leg.  Tr. 550.  He fell and broke his ankle as well.  Tr. 550.  He also described pain in his shoulders and headaches to the point that "a lot of days [he doesn't] even get out of bed."  Tr. 550.  This happens about once per week.  Tr. 550.

One of Fleshner's hobbies is leather working, but he is only able to do this for short periods of time because it puts pressure on his hands and they lock up into a "paralyzed" position.  Tr. 552.  He purchased a hot tub and using it has brought him some relief.  Tr. 552.  He claims that his pain is always present and that he has not found anything to relieve it.  Tr. 553.  Although the cortisone injections help for a period of time, the relief is shorter and shorter with each injection.  Tr. 553.

Fleshner cannot write for a long period of time without his hands locking up, and he does not know how to type.  Tr. 553.  He experiences numbness in his right, three outside fingers that extends up into his arm and into his leg.  Tr.

16

553.

Fleshner has a lot of difficulty sleeping and soaks his bed every night in sweat. Tr. 554. His doctors have told him the sweating episodes are due to his prescription medications and his body fighting the pain. Tr. 554. At the time of the hearing, Fleshner stated he takes the following medications: Mobic,[19] Cyclobenzaprine,[20] Neurontin,[21] Atenolol,[22] Trazodone,[23] Effexor,[24] Depakote,[25] Duragesic patches,[26] and

---

[19]Meloxicam [Mobic] is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis (arthritis caused by a breakdown of the lining of the joints) and rheumatoid arthritis (arthritis caused by swelling of the lining of the joints).

[20]Muscle relaxant.

[21]Seizure medication.

[22]High blood pressure medication. See also definitions in previous footnotes.

[23]Antidepressant.

[24]Antidepressant.

[25]Drug used to treat seizure disorders, certain psychotic conditions and to prevent migraine headaches.

[26]Strong narcotic pain reliever.

17

Glucosamine Chondroitin.[27]  Tr. 554-555.

Fleshner explained that he can only lift 5-10 pounds before he starts feeling pain, and that he can only walk about one block.  Tr. 555.  He stated that he cannot bend over and going up and down stairs hurts his knees.  Tr. 556.  He can stand for only half an hour before his knees and hips begin to hurt.  Tr. 556.  Sitting in a chair causes his lower back to hurt and requires him to stand periodically.  Tr. 556.  He cannot find relief in any position including laying down.  Tr. 557.

Fleshner testified to experiencing depression and to seeing Drs. Anderson and McCormick for this condition.  Tr. 558.  He becomes very frustrated because he cannot weld any longer.  Tr. 558.  He does some light housework around his home, but he needs to take breaks.  Tr. 559.  He used to ride his horses every day, but now he only does it a couple times per year for half an hour at a time.  Tr. 560.  He is able to shower, but no longer able to get into the bathtub.  Tr. 560.

The ALJ asked the Vocational Expert ("VE") one hypothetical question at the first hearing that encompassed

_____

[27] Natural compounds used to treat osteoarthritis.

many physical, mental and attendance limitations. The VE responded to the ALJ's hypothetical by stating under the conditions posed by the question, Fleshner could not do his past relevant work; he would have no usable transferable skill and there would be no unskilled jobs that he could perform. Tr. 562. No other hypothetical questions were asked at the hearing.

**B.  Hearing of December 21, 2004**

A supplemental hearing was held before the ALJ on December 21, 2004. Tr. 566. At the second hearing, the ALJ asked the VE a second hypothetical question. Tr. 567. In response to this hypothetical, the VE stated that Fleshner could not do any of his past relevant work and that there were no transferable skills but that there were unskilled positions available, such as a counter attendant, arcade attendant or library aide. Tr. 567-568. This is ultimately what the ALJ finds. However, Fleshner's attorney adjusted the hypothetical to take into account Fleshner's testimony at the first hearing that he could not use his upper extremities. Tr. 569. This testimony is corroborated by Fleshner's medical records, as discussed above. When asked if there were any jobs he could

19

do in that situation, the VE said no because most unskilled jobs require a lot of upper extremity use.  Tr. 569-570.[28]

## IV.  THE ALJ'S DECISION

The ALJ found that Fleshner has severe impairments, including:  multisegmental lumbar spondylosis[29] with mild degenerative disc collapse at multiple levels without significant foraminal stenosis[30] or central stenosis;[31] degenerative disc disease of the cervical spine and history of compression fractures of the thoracic spine; affective

---

[28]The ALJ relies on a letter dated December 24, 2003, exhibit 76F, from Dr. Spence (neurologist); but Dr. Palma (rheumatologist), of the same clinic, wrote a subsequent letter on July 29, 2004, describing more limitations. See Tr. Nos. 500 and 535.  Plaintiff argues that the ALJ should not rely upon the first letter which states he can lift or carry 20-30 lbs. because the second letter contains greater restrictions and says Fleshner is "unable to be gainfully employed in any job involving physical exertion that require use of his upper extremities for lifting or overhead activities; or activity requiring prolonged standing or sitting, bending or stooping for any significant amount of time."  76F turns out to be the crux of why the ALJ denied benefits, which will be discussed in the next section.

[29]Any of various degenerative diseases of the lumbar (lower) spine.

[30]A narrowing or constriction of the diameter of a bodily passage or orifice.

[31]A narrowing or constriction of the diameter of a bodily passage or orifice.

Case 3:06-cv-03018-DEO   Document 19   Filed 08/27/07   Page 20 of 43

disorder variously described as dysthymia[32] and major depressive disorder in partial remission; osteoarthritis of the knees, status post arthroscopic surgeries; history of migraine headaches; bilateral rotator cuff tendinitis; hypertension, and; history of mild carpal tunnel syndrome. Tr. 40. However, the ALJ found that Fleshner retains the "residual functional capacity to perform the exertional and non-exertional requirements of work except":

> [L]ifting more than 20-30 pounds occasionally and 10 pounds more frequently. He can sit at least one hour at a time, for up to 6 hours of an 8 hour workday. He can stand at least one hour at a time, for up to 6 hours of an 8 hour workday. He can walk 2 blocks at a time. He can only occasionally climb ramps and stairs; balance; stoop; kneel; crouch; crawl and bend. He must avoid more than low stress work above a level 4 on a scale of 1-10, with 10 representing highly stressed work. He should avoid concentrated exposure to fumes, dusts, and gases. He should avoid concentrated exposure to extremes of cold, humidity and he should avoid hazards such as working at heights.

Tr. 40.

---

[32] A mood disorder characterized by chronic mildly depressed or irritable mood often accompanied by other symptoms (as eating and sleeping disturbances, fatigue, and poor self-esteem).

The ALJ does not give full weight or credibility to Fleshner's subjective complaints of pain. The ALJ finds that Fleshner cannot do his past relevant work nor does he have transferable skills. Tr. 41. However, as mentioned earlier, he finds that there are unskilled jobs in the economy Fleshner can do, including arcade attendant, counter attendant or library aide. Tr. 41.

## V.  LAW AND ANALYSIS

This Court must determine whether the Commissioner's decision to deny disability benefits is "supported by substantial evidence on the record as a whole." <u>Lorenzen v. Chater</u>, 71 F.3d 316, 318 (8th Cir. 1995).

### A.  The Court's Jurisdictional Basis

In <u>Bowen v. Yuckert</u>, 482 U.S. 137 (1987), the United States Supreme Court delineated the steps which precede a district court's review of a Social Security appeal:

> The initial disability determination is made by a state agency acting under the authority and supervision of the Secretary. 42 U.S.C. § 421(a), 1383b(a); 20 C.F.R. §§ 404.1503, 416.903 (1986). If the state agency denies the disability claim, the claimant may pursue a three-stage administrative review process. First, the determination is reconsidered de novo by the state agency. 20 C.F.R. §§ 404.909(a),

22

416.1409(a). Second, the claimant is
entitled to a hearing before an
administrative law judge (ALJ) within the
Bureau of Hearings and Appeals of the
Social Security Administration. 42 U.S.C.
§§ 405(b)(1), 1383(c)(1) (1982 ed. and
Supp. III); 20 C.F.R. §§ 404.929, 416.1429,
422.201 et seq. (1986). Third, the
claimant may seek review by the Appeals
Council. 20 C.F.R. §§ 404.967 et seq.,
416.1467 et seq. (1986). Once the claimant
has exhausted these administrative
remedies, he may seek review in federal
district court. 42 U.S.C. §405(g).

<u>Yuckert</u>, 482 U.S. 137, 142, 107 S. Ct. 2287, 2291 96 L. Ed. 2d
119 (1987).

Section 1383(c)(3) of Title 42 of the United States Code

provides, "The final determination of the Secretary after a

hearing . . . shall be subject to judicial review as provided

in section 405(g) of this title. . . ." In pertinent part, 42

U.S.C. § 405(g) provides:

Any individual, after any final decision of
the Commissioner of Social Security made
after a hearing to which he was a party,
irrespective of the amount in controversy,
may obtain a review of such decision by a
civil action . . .brought in the district
court of the United States for the judicial
district in which the plaintiff resides...
The court shall have power to enter, upon
the pleadings and transcript of the record,
a judgment affirming, modifying, or
reversing the decision of the Commissioner
of Social Security, with or without
remanding the cause for a rehearing. The

23

>findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . . The judgment of the court shall be final except that it shall be subject to review in the same manner as a judgment in other civil actions . . . .

Accordingly, this Court may affirm, reverse or remand the ALJ's decision.

**B.   The Substantial Evidence Standard**

The Eighth Circuit has made clear its standard of review in Social Security cases.   If supported by substantial evidence in the record as a whole, the Secretary's findings are conclusive and must be affirmed.   Grissom v. Barnhart, 416 F.3d 834, 837 (8th Cir. 2005); Smith v. Shalala, 31 F.3d 715, 717 (8th Cir. 1994) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971); 42 U.S.C. § 405(g) (Supp. 1995)). "Substantial evidence 'is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion.'" Maresh v. Barnhart, 438 F.3d 897, 898 (8th Cir. 2006) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).   In the words of the Supreme Court, substantial evidence is "more than a mere scintilla.   It means such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion."
Richardson v. Perales, 402 U.S. 389, 401 (1971) (citing
Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

The Eighth Circuit has taken pains to emphasize that,
"[a] notable difference exists between 'substantial evidence'
and 'substantial evidence on the record as a whole.'" Wilson
v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989) (quoting
Jackson v. Bowen, 873 F.2d 1111, 1113 (8th Cir. 1989)).

> "Substantial evidence" is merely such
> "relevant evidence that a reasonable mind
> might accept as adequate to support a
> conclusion." "Substantial evidence on the
> record as a whole," however, requires a
> more scrutinizing analysis. In the review
> of an administrative decision, "[t]he
> substantiality of evidence must take into
> account whatever in the record fairly
> detracts from its weight." Thus, the court
> must also take into consideration the
> weight of the evidence in the record and
> apply a balancing test to evidence which is
> contradictory.

Id.

The Court, however, does "'not re-weigh the evidence or
review the factual record de novo.'" Roe v. Chater, 92 F.3d
672, 675 (8th Cir. 1996) (quoting Naber v. Shalala, 22 F.3d
186, 188 (8th Cir. 1994)). Likewise, it is not this Court's
task to review the evidence and make an independent decision.

25

_Ostronski v. Chater_, 94 F.3d 413, 416 (8th Cir. 1996) (citing _Mapes v. Chater_, 82 F.3d 259, 262 (8th Cir. 1996)). "If, after review, [it is] possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [this Court] must affirm the denial of benefits." _Id._ Even in the case where this Court "might have decided the case differently," this Court cannot reverse if there is substantial evidence to support the Commissioner's decision. _Fredrickson v. Barnhart_, 359 F.3d 972, 976 (8th Cir. 2004) (citing _Krogmeier v. Barnhart_, 294 F.3d 1019, 1022 (8th Cir. 2002)).

The process, however, is not stacked in the Commissioner's favor because, "[t]he standard requires a scrutinizing analysis, not merely a 'rubber stamp' of the [Commissioner]'s action." _Cooper v. Secretary_, 919 F.2d 1317, 1320 (8th Cir. 1990) (citing _Thomas v. Sullivan_, 876 F.2d 666, 669 (8th Cir. 1989)). In cases where the Commissioner's position is not supported by substantial evidence in the record as a whole, the Court must reverse. _See Lannie v. Shalala_, 51 F.3d 160, 164 (8th Cir. 1995). "'[T]he goals of the Secretary and the advocates should be the same: that

26

deserving claimants who apply for benefits receive justice.'"
<u>Battles v. Shalala</u>, 36 F.3d 43, 44 (8th Cir. 1994) (quoting
<u>Sears v. Bowen</u>, 840 F.2d 394, 402 (7th Cir. 1988)).

**C.  Determination of Disability**

Social Security disability benefits may be awarded to
disabled individuals who meet certain income and resource
guidelines.  42 U.S.C.A. § 423 (d)(1)(A).  In connection with
the award of such benefits to an adult:

> [A]n individual shall be considered to be
> disabled . . . if he is unable to engage in
> any substantial gainful activity by reason
> of any medically determinable physical or
> mental impairment which can be expected to
> result in death or which has lasted or can
> be expected to last for a continuous period
> of not less than twelve months.

42 U.S.C.A. § 423 (d)(1)(A).

An impairment will only be considered of such severity if
the individual is "not only unable to do his previous work but
cannot, considering his age, education, and work experience,
engage in any other kind of substantial gainful activity which
exists in the national economy. . . ."  42 U.S.C.A. § 423
(d)(2)(A).

Determination of a claimant's disability involves a five-
step analysis.  20 C.F.R. § 404.1520 (a-f).  In the first

step, the ALJ determines if the claimant had engaged in past substantial gainful activity. Next, the ALJ decides if the claimant has an impairment. Third, the ALJ must look at the regulations to determine if the impairment meets or is medically or functionally equal to a Listing in Appendix 1, Subpart P of Regulation No. 4. Fourth, the ALJ assesses the claimant's residual functional capacity ("RESIDUAL FUNCTIONAL CAPACITY"), to see if the claimant could perform his past relevant work. At the fifth and final step of the analysis, the Social Security Commission must prove that there are a significant number of jobs (other than his past relevant work) in the national economy that a person of the same age, education, past work experience, and physical and mental residual functional capacity can perform. 20 C.F.R. § 404.1520 (f).

To acquire Social Security disability benefits, initially the claimant has the burden of showing 'that [he] is unable to perform [his] past relevant work.'" Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001) (quoting Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998)). This encompasses the first four steps of the analysis. "If the claimant carries [his]

burden, 'the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the physical residual functional capacity to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and with vocational factors such as age, education, and work experience.'" Id. There must be some medical evidence to support the ALJ's determination of the claimant's residual functional capacity, and this evidence should address the claimant's ability to function in the workplace. Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam); Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).

   **D.   Standard for Reviewing the ALJ's Decision**

   "Deference to the ALJ's credibility determination is warranted if the determination is supported by good reasons and substantial evidence." Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005). By that same token, the ALJ's credibility determination should not just be stated as a conclusion in the guise of findings, but should be closely and affirmatively linked to substantial evidence. Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995).

Additionally, the law in the Eighth Circuit is well settled that an ALJ may not discredit a claimant's subjective complaints of pain, discomfort, or other disabling limitations simply because there is a *lack of objective evidence*.  See Ramirez v. Barnhart, 292 F.3d 576, 581 (8th Cir. 2002) (noting that the ALJ may not discredit a claimant solely because the objective medical evidence does not fully support the claimant's subjective complaints of pain).  Instead, the ALJ may only discredit the subjective complaints if they are inconsistent with the record as a whole.  See Dixon v. Barnhart, 353 F.3d 602, 605 (8th Cir. 2003); see also Bishop v. Sullivan, 900 F.2d 1259, 1262 (8th Cir. 1990) (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)).

Under Polaski, the ALJ must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to:  1) the claimant's daily activities; 2) the duration, frequency and intensity of the pain; 3) precipitating and aggravating factors; 4) dosage, effectiveness and side effects of medication; and 5)

30

functional restrictions. <u>Polaski</u>, 739 F.2d at 1322. When the ALJ considers all of the <u>Polaski</u> factors and still makes a determination to reject a claimant's subjective complaints, the ALJ must give "good reasons" for discrediting the claimant's testimony. <u>Hogan v. Apfel</u>, 239 F.3d 958, 962 (8th Cir. 2001). If an ALJ discredits a claimant's testimony and gives good reasons for doing so, the ALJ's decision should normally receive deferential treatment. <u>Id.</u> (quoting <u>Dixon v. Sullivan</u>, 905 F.2d 237, 238 (8th Cir. 1990)).

**E.  Analysis of the ALJ's Decision**

Fleshner argues that the ALJ did not give proper weight to the opinions of his treating physicians and substitutes his opinions for that of the providers. Further, in May 2004, Dr. Huwe concluded that Fleshner could lift no more than 10 pounds regularly; and in July of the same year, Dr. Palma determined that Fleshner could not stand or sit for a significant period of time. But, the ALJ rejected these determinations made by Fleshner's treating providers. Fleshner further argues that the ALJ cannot systematically reject all opinions of the treating chiropractor, Dr. Hoogestraat, which was done in this case.

31

The Commissioner argues that Dr. Palma's opinions were properly discounted because they were conclusory and inconsistent with the record as a whole. The Commissioner points out that the ALJ accepted Dr. Huwe's opinion that Fleshner could not return to his past work but did not accept her opinion that Fleshner was not "employable". The Commissioner also argues that Dr. Federhofer's opinions were inconsistent with the record, particularly the evidence of Fleshner's ability to stand, which he stated himself he could do for about a half an hour. Because of the inconsistencies in these providers' opinions with the record, the Commissioner argues that the ALJ gave them proper weight.

The Commissioner argues that the ALJ properly discounted Fleshner's subjective complaints of pain. For example, Fleshner stated that he could not sit for long periods of time but he was able to sit in his truck while his wife went shopping. The Commissioner also points out that Fleshner rides horses and that he did leather work every day, which the Commissioner contends is inconsistent with his claims that his hands cramp and freeze up. Fleshner also testified he helped with vacuuming, emptying the dishwasher and cooking

occasionally. Further, he fed horses and moved bales of hay. These activities, according to the Commissioner, are inconsistent with Fleshner's subjective complaints of pain and the ALJ gave them the proper weight.

After careful review of the administrative record, this Court is persuaded that there is not substantial evidence to support the ALJ's decision, nor does this Court find it necessary to remand the decision for further factual findings. This Court is persuaded that there is substantial evidence that Fleshner's physical and mental problems are so severe as to be disabling and that he could not return to his past work or other jobs in the national economy.

Substantial evidence on the record, including medical records, testimony from Fleshner and the VE, indicates that Fleshner is disabled. The reason the ALJ found otherwise is because he essentially discredited Fleshner's complaints of pain that he testified to and that were reported in his medical records. When applying the factors in <u>Polaski</u>, it becomes clear that the ALJ did not consider all of the evidence presented relating to Fleshner's subjective complaints.

33

### 1. Fleshner's Daily Activities

Even though Fleshner engages in some activity, the ability to do light activities around the home "provides little or no support for the finding that a claimant can perform full-time competitive work." Baker v. Barnhart, 457 F.3d 882, 897 (8th Cir. 2006) (citing Hogg v. Shalala, 45 F.3d 276, 278 (8th Cir. 1995; Baumgarten v. Chater, 75 F.3d 366, 369 (8th Cir. 1996)).

> [The] ability to engage in some life activities...does not support a finding that [a claimant] retains the ability to work...We have long stated that to determine whether a claimant has the residual functional capacity necessary to be able to work we look to whether she[/he] has "the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc). This test is consistent with relevant regulations on the issue, see 20 C.F.R. § 404.1545.

Forehand v. Barnhart, 364 F.3d 984, 988 (8th Cir. 2004).

The Commissioner exaggerates the frequency of Fleshner's horse riding and leather working activities. Fleshner clearly stated at the ALJ hearing that he only rides horses twice per yea, and then only for about 30 minutes at a time.

34

Additionally, Fleshner also stated that he is only able to perform leather working for short periods of time because of his hand pain. Performing these activities, activities that he claims to very much enjoy doing, on such a limited basis, is not inconsistent with the pain Fleshner has alleged. Nor are these activities inconsistent with his medical records.

**2. Duration, Frequency and Intensity of Fleshner's Pain**

This Court does not find Fleshner's ongoing complaints of pain to be inconsistent with the record as a whole. Fleshner testified before the ALJ that most of his pain is in his lower back and hips. Several of Fleshner's treating physicians, including Dr. Huwe and Dr. Palma, have diagnosed him as having "chronic pain" that has been present for a period of time and will not get better. Dr. Federhofer recommended Fleshner be placed on disability because of back pain causing migraine headaches. Dr. Federhofer opines that Fleshner will require "ongoing recurrent pain therapy" for his "chronic pain condition". Tr. 508. In fact, Dr. Perera, Fleshner's neurosurgeon for radiating hip and leg pain, wrote that he has "nothing to offer" Fleshner and that seven other physicians have already declared him disabled. Tr. 284.

35

### 3. Precipitating and Aggravating Factors

Fleshner's chronic pain is caused primarily by degenerative changes that, by their very definition, will only get worse over time. Dr. Federhofer states that Fleshner will require "ongoing recurrent pain therapy" to manage his conditions. Tr. 508. The fact that Fleshner is looking at a lifetime of pain and has doctors noting that there is nothing more medically that can be done for him heavily weighs in his favor for receiving disability benefits.

### 4. Dosage, Effectiveness and Side Effects of Medicines

Fleshner takes numerous prescription medications to manage his several conditions. At the time of hearing, Fleshner stated that he was taking Mobic, Cyclobenzaprine, Neurontin, Atenolol, Trazodone, Effexor, Depakote, Duragesic patches and Glucosamine Chondroitin.[33] This list of drugs includes strong narcotic pain killers, muscle relaxants, anti-seizure medications and anti-depressants. These are not the types of drugs or the quantities of drugs people take unless they really need them. However, these drugs do cause several

---

[33] These drugs are defined on pages 3-4, 8-9 and 17-18 of this Order.

36

side effects that are pertinent to Fleshner's disability claim. Dr. Federhofer notes that "a number of the medications [Fleshner is taking] can affect his ability to function on a daily basis" and can cause "difficulty concentrating for prolonged period (sic.) of time." Tr. 507. Fleshner testified that he drenches his bed every night in sweat and that his doctors told him this is due to all of the medications he is taking and his body fighting pain.

### 5. Functional Restrictions

Fleshner's functional restrictions are well-documented throughout the record. Dr. Huwe states that he should not kneel, stoop, crawl, climb or perform any type of "physical job". Tr. 233. Dr. Huwe states several times that in her opinion, Fleshner is "totally disabled." Tr. 233. Dr. Federhofer also noted that Fleshner cannot do any work requiring him to crawl, kneel, stand, prolonged extension or flexion of the neck or activities requiring heavy lifting, nor should he work in cold areas or at heights. Dr. Hoogestratt placed several restrictions on Fleshner, including: Lifting and carrying a minimum of 10-15 pounds infrequently; minimal standing, walking and sitting due to degenerative changes in

Case 3:06-cv-03018-DEO   Document 19   Filed 08/27/07   Page 37 of 43

his spine; no stooping, climbing, kneeling or crawling, and; minimal traveling.

Fleshner's long-time rheumatologist, Dr. Palma, states that Fleshner has degenerative disk disease of the cervical and lumbar spine. Tr. 535. Dr. Palma further opines that Fleshner is "unable to be gainfully employed in any job involving physical exertion that require use of his upper extremities for lifting or overhead activities, or activity requiring prolonged standing or sitting, bending or stooping for any significant amount of time." Tr. 535.

Stephen Kieszkowski performed a functional capacity evaluation on Fleshner in April of 2005, and found that he should never work with his arms over his head, squat or crouch or climb a ladder. Tr. 538. Additionally, Mr. Kieszkowski states that Fleshner has "multiple major areas [of dysfunction] that span across all aspects of the [functional capacity evaluation]" and that he is "incapable of sustaining the light level of work for an 8-hour day." Tr. 539. The VE also testified before the ALJ that if Fleshner could not use his upper extremities to perform a job, that would "eliminate...competitive employment" because almost all

unskilled work requires the use of the upper extremities. Tr. 569-570. The ALJ chose not to incorporate Fleshner's inability to use of his upper extremities, that is supported by the substantial evidence in the record as a whole.

> "Testimony based on hypothetical questions that do not encompass all relevant impairments cannot constitute substantial evidence to support the ALJ's decision." <u>Hillier v. Soc. §. Admin.</u>, 486 F.3d 359, 365 (8th Cir. 2007) (quoting <u>Lacroix v. Barnhart</u>, 465 F.3d 881, 889 (8th Cir. 2006)). "Hypothetical questions should set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments." <u>Hillier</u>, 486 F.3d at 365 (internal quotations omitted).

<u>Wilson v. Astrue</u>, ___ F.3d ___, 2007 WL 2050836, 2 (8th Cir. 2007).

Instead of relying on the opinions of Fleshner's long-time treating physicians, the ALJ chose to rely upon the opinions of Dr. Caple Spence (who saw Fleshner twice, according the record), and a letter at Tr. 550. This cannot be maintained. A treating physician's opinion is entitled to more weight than that of opinions from mere "consultative examinations". See 20 C.F.R. § 404.1527(d)(2).

## VI. CONCLUSION

The overwhelming evidence on the record as a whole is

that Fleshner has both objective findings of disability and subjective complaints of pain. The record is replete with Fleshner's subjective complaints, which are consistent throughout his medical history. The ALJ discredited all of these findings and held that Fleshner exaggerated his pain and was generally not credible. However, the ALJ may only discredit the subjective complaints if they are inconsistent with the record as a whole. Fleshner's subjective complaints of pain are consistent with the record.

Add to this Fleshner's diagnosis of general depressive disorder and generalized anxiety disorder, and this Court cannot affirm the decision of the ALJ that Fleshner is not disabled. That decision has little support in the record. Indeed, the record supports that Fleshner was disabled and is unable to perform even a light range of work. "Although remand . . . is the normal remedy, remand is not necessary where the record overwhelmingly supports a finding of disability." Taylor v. Chater, 118 F.3d 1274, 1279 (8th Cir. 1997). The Court, therefore, reverses and remands for the computation of benefits.

**Upon the foregoing,**

**IT IS HEREBY ORDERED** that the decision of the ALJ is reversed, and the Commissioner is directed to compute and award disability benefits to Fleshner with an onset date of June 14, 2004, continuing through January 12, 2005, the date Fleshner started receiving benefits on a subsequently filed application for benefits.[34]  The Court is aware that the ALJ,

---

[34] The Court has thoroughly reviewed Fleshner's medical records and has determined that the date of June 14, 2004, reasonably reflects the onset of Fleshner's disability. During the months of June and July of 2004, several of Fleshner's treating physicians all offered strong opinions of his disability.  On June 14, 2004, in a letter to Disability Services, Fleshner's primary-care physician, Dr. Huwe, stated that based on his ailments and medications, Fleshner is "not employable in his present state and his present state will continue to deteriorate."  Tr. 530.  On June 26, 2004, Fleshner's pain doctor, Dr. Federhofer, states that Fleshner cannot "function in an industrial setting performing manual labor and would have difficulty concentrating for prolonged periods of time."  Tr. 507.  Dr. Federhofer explains that Fleshner will require "ongoing recurrent pain therapy in addition to treatment of depression secondary to the chronic pain condition.  Tr. 508.  On June 29, 2004, Fleshner's chiropractor of over 25 years explained Fleshner's chronic pain and how his conditions have deteriorated over the years "due to pain and discomfort...in his spine."  Tr. 509.  Dr. Hoogestraat "strongly" supports Fleshner's disability request.  Tr. 509.  On July 29, 2004, Fleshner's rheumatologist, Dr. Palma states that Fleshner has degenerative disk disease of the cervical and lumbar spine.  Tr. 535.  Dr. Palma further opines that Fleshner is "unable to be gainfully employed in any job involving physical exertion that require use of his upper extremities for lifting or overhead activities, or activity requiring prolonged standing or sitting, bending or

(continued…)

Case 3:06-cv-03018-DEO   Document 19   Filed 08/27/07   Page 41 of 43

not the doctors, has the job of determining who is disabled. See 20 C.F.R. § 404.1527(e)(1). However, as set out in <u>Kelley v. Callahan</u>, 133 F.3d 583, 589 (8th Cir. 1998), a diagnosis by a doctor that says the patient cannot work full-time has been approved. "The assumption that physicians cannot opine as to the hours a claimant can work is wrong." <u>Id.</u>

A timely application for attorney fees, pursuant to the Equal Access to Justice Act, 28 U.S.C. §2412 (EAJA), must be filed within thirty days of the entry of final judgment in this action. Thus, if this decision is not appealed, and Fleshner's attorney wishes to apply for EAJA fees, he must do

---

[34] (...continued)
stooping for any significant amount of time." Tr. 535.

This Court cannot definitively pin point Fleshner's exact disability onset date, but it can say that in the summer of 2004, the doctor's Fleshner saw on a regular basis all seem to be in agreement that Fleshner's conditions render him disabled. The Court, giving Fleshner the benefit, feels it is reasonable to pick the earliest date of these records, which happens to be Dr. Huwe's June 14, 2004, opinion letter, as an onset date. That is the rationale behind this date.

The Court has been informed by counsel for the parties that Fleshner filed a subsequent disability application and was granted benefits, without hearing, as of January 13, 2005. The Court is therefore ordering benefits paid during a "window" of time from when the Court believes Fleshner became disabled until the Social Security Commissioner subsequently granted him benefits.

42

so within 30 days of the entry of the final judgment in this case.

       **IT IS SO ORDERED** this 27th day of August, 2007.

                              Donald E. O'Brien, Senior Judge
                              United States District Court
                              Northern District of Iowa

43